# 17-2849

IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

ABC,
Plaintiff

RONNIE VAN ZANT, INC., GARY R. ROSSINGTON, JOHNNY VAN VANT, BARBARA
HOUSTON, as the Trustee of the ALLEN COLLINS TRUST, and ALICIA RAPP and CORINNA
GAINES BIEMILLER, as the Personal Representatives of the Estate of STEVEN GAINES,
Plaintiffs-Appellees,

v.

CLEOPATRA RECORDS, INC., CLEOPATRA FILMS, a division of CLEOPATRA RECORDS,
INC.,
Defendants-Appellants.

DEF, ARTIMUS PYLE a/k/a THOMAS D. PYLE, JOHN DOE, JANE DOE, XYZ CORPORATION,
AND XYZ LLC (the names of the last four defendants being fictitious and unknown to plaintiffs, and
intended to be designate persons or entities that have or may have a role in the production and
distribution of the Motion Picture complained of in the Complaint herein),
Defendants

On Appeal from the United States District Court
for the Southern District of New York

**[PROPOSED] BRIEF OF _AMICI CURIAE_ THE REPORTERS COMMITTEE
FOR FREEDOM OF THE PRESS AND 13 MEDIA ORGANIZATIONS
IN SUPPORT OF DEFENDANTS-APPELLANTS URGING REVERSAL**

Bruce D. Brown, Esq.
Counsel of Record
Gregg P. Leslie, Esq.
Caitlin Vogus, Esq.
THE REPORTERS COMMITTEE FOR
  FREEDOM OF THE PRESS
1156 15th Street NW, Ste. 1250
Washington, D.C. 20005
Telephone: (202) 795-9300
Facsimile: (202) 795-9310

Additional _amici_ counsel listed in Appendix B

## CORPORATE DISCLOSURE STATEMENT

The Reporters Committee for Freedom of the Press is an unincorporated association of reporters and editors with no parent corporation and no stock.

American Society of News Editors is a private, non-stock corporation that has no parent.

The Associated Press Media Editors has no parent corporation and does not issue any stock.

Association of Alternative Newsmedia has no parent corporation and does not issue any stock.

The Association of American Publishers, Inc. is a nonprofit organization that has no parent and issues no stock.

There are no publicly held corporations or other public entities that own more than 10% of Discovery Communications LLC's stock.

Dow Jones is a Delaware corporation with its principal place of business in New York. News Corporation, a publicly held company, is the indirect parent corporation of Dow Jones. Ruby Newco, LLC, a subsidiary of News Corporation and a non-publicly held company, is the direct parent of Dow Jones. No publicly held company directly owns 10% or more of the stock of Dow Jones.

First Amendment Coalition is a nonprofit organization with no parent company. It issues no stock and does not own any of the party's or amicus' stock.

i

First Look Media Works, Inc. is a non-profit non-stock corporation organized under the laws of Delaware.  No publicly-held corporation holds an interest of 10% or more in First Look Media Works, Inc.

The International Documentary Association is a not-for-profit organization with no parent corporation and no stock.

The Investigative Reporting Workshop is a privately funded, nonprofit news organization affiliated with the American University School of Communication in Washington.  It issues no stock.

MPA – The Association of Magazine Media has no parent companies, and no publicly held company owns more than 10% of its stock.

National Press Photographers Association is a 501(c)(6) nonprofit organization with no parent company.  It issues no stock and does not own any of the party's or amicus' stock.

The Tully Center for Free Speech is a subsidiary of Syracuse University.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iv

STATEMENT OF IDENTITY AND INTEREST OF *AMICI CURIAE* ................. 1

SOURCE OF AUTHORITY TO FILE .................................................... 2

SUMMARY OF THE ARGUMENT ...................................................... 3

ARGUMENT ............................................................................... 5

    I.   The First Amendment fully protects films, including dramatizations like Cleopatra's "Street Survivors." ..................................................... 5

   II.  Prior restraint of speech is unconstitutional in all but the rarest of circumstances. ........................................................................ 9

       A.    Prior restraints directly contravene the First Amendment's purpose and history of protecting expressive speech. ..................................... 11

       B.    The Supreme Court has regularly rejected prior restraints, with only very limited exceptions. .................................................... 13

       C.    Even if Cleopatra is bound by the consent decree, the proper remedy is an action for damages, not a prior restraint. ............................. 16

CONCLUSION ............................................................................. 19

CERTIFICATE OF COMPLIANCE WITH RULE 32(g) .............................. 20

APPENDIX A ............................................................................... 21

APPENDIX B ............................................................................... 26

CERTIFICATE OF SERVICE ............................................................ 27

# TABLE OF AUTHORITIES

## CASES

*Alexander v. United States*, 509 U.S. 544 (1993) .................................................. 10

*Alfano v. NGHT, Inc.*, 623 F. Supp. 2d 355 (E.D.N.Y. 2009) ............................... 7

*Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963) .......................................... 9, 16

*Brandreth v. Lance*, 8 Paige Ch. 24 (N.Y. Ch. 1839) ............................................ 12

*Brown v. Entm't Merchants Ass'n*, 564 U.S. 786 (2011) ....................................... 5

*CBS Inc. v. Davis*, 510 U.S. 1315 (1994) ......................................................... 17, 18

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*,
    447 U.S. 557 (1980) ...................................................................................... 16

*Commonwealth v. Blanding*, 20 Mass. 304 (1825) ............................................... 12

*Freedman v. Maryland*, 380 U.S. 51 (1965) ........................................................ 15

*Guglielmi v. Spelling-Goldberg Prods.*, 603 P.2d 454 (Cal. 1979) ....................... 7

*Hicks v. Casablanca Records*, 464 F. Supp. 426 (S.D.N.Y. 1978) ........................ 6

*In re King World Prods., Inc.*, 898 F.2d 56 (6th Cir. 1990) ................................. 18

*Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495 (1952) ........................................... 5

*Kingsley Books v. Brown*, 354 U.S. 436 (1957) ................................................... 16

*Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753 (1994) ................................ 17

*Matthews v. Wozencraft*, 15 F.3d 432 (5th Cir. 1994) .......................................... 6

*Meeropol v. Nizer*, 560 F.2d 1061 (2d Cir. 1977) ................................................. 6

*Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241 (1974) ................................... 16

*N.Y. Times Co. v. United States*, 403 U.S. 713 (1971) (per curiam)
    (the "*Pentagon Papers*" case) .......................................................... 4, 14, 15, 17

*Near v. Minnesota ex rel. Olson*, 283 U.S. 697 (1931) .............................. 11, 13, 14

*Neb. Press Ass'n v. Stuart*, 427 U.S. 539 (1976) ......................................... *passim*

*Org. for a Better Austin v. Keefe*, 402 U.S. 415 (1971) ....................................... 18

*Patterson v. Colorado*, 205 U.S. 454 (1907) ....................................................... 12

*Rombom v. Weberman*, 309 A.D.2d 844 (N.Y. App. Div. 2003) .......................... 18

iv

*Ronnie Van Zant, Inc. v. Pyle*, No. 17 CIV. 3360 (RWS),
  2017 WL 3721777 (S.D.N.Y. Aug. 28, 2017) ................................................ 7

*Rosemont Enters. v. McGraw-Hill Book Co.*, 85 Misc.2d 583
  (N.Y. Sup. Ct. 1975) ..................................................................................... 7

*Seale v. Gramercy Pictures*, 949 F. Supp. 331 (E.D. Pa. 1996) ........................ 6

*Thomas v. Chi. Park Dist.*, 534 U.S. 316 (2002) ........................................... 15

*Tyne v. Time Warner Entm't Co., L.P.*, 901 So.2d 802 (Fla. 2005) .................. 7

*United States v. Quattrone,* 402 F.3d 304 (2d Cir. 2005) ............................... 16

*Vance v. Universal Amusement Co., Inc.*, 445 U.S. 308 (1980) (per curiam) ........ 17

*Winters v. New York*, 333 U.S. 507 (1948) ..................................................... 5

**OTHER AUTHORITIES**

Akhil Reed Amar, *How America's Constitution Affirmed Freedom of Speech Even
Before the First Amendment*, 38 Cap. U. L. Rev. 503 (2010) ............................ 12

Ashutosh Bhagwat, *Posner, Blackstone, and Prior Restraints on Speech*, 2015
B.Y.U. L. Rev. 1151 (2015) .............................................................................. 12

Michael Meyerson, *The Neglected History of the Prior Restraint Doctrine:
Rediscovering the Link Between the First Amendment and the Separation of
Powers*, 34 Ind. L. Rev. 295 (2001) ................................................................ 13

*The People v. O.J. Simpson: American Crime Story*, Emmys,
https://perma.cc/7LWU-85B6 (last visited Sept. 29, 2017) ............................. 8

**RULES**

Fed. R. App. P. 29 ....................................................................................... 1, 2

Local R. 29.1 ................................................................................................... 1

**TREATIES**

4 William Blackstone, Commentaries ............................................................. 11

M. Nimmer, Nimmer on Freedom of Speech § 4.03 (1984) ............................. 10

W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 117 (5th ed.
1984) ............................................................................................................. 6

## STATEMENT OF IDENTITY AND INTEREST OF *AMICI CURIAE*

*Amici curiae* are the Reporters Committee for Freedom of the Press, American Society of News Editors, Associated Press Media Editors, Association of Alternative Newsmedia, Association of American Publishers, Inc., Discovery Communications, LLC, Dow Jones & Company, Inc., First Amendment Coalition, First Look Media Works, Inc., International Documentary Assn., Investigative Reporting Workshop at American University, MPA – The Association of Magazine Media, National Press Photographers Association, and Tully Center for Free Speech. A supplemental statement of identity and interest of *amici curiae* is included below as Appendix A.[1]

*Amici* file this brief in support of Defendants-Appellants Cleopatra Records, Inc. and Cleopatra Films (collectively, "Cleopatra"). *Amici* include members of the news media or organizations that represent publishers and journalists. Accordingly, *amici* or the journalists whom they represent or publish frequently rely on sources who may be contractually prohibited from speaking, such as through nondisclosure agreements, to report on matters of public concern. *Amici*

---

[1] Pursuant to Fed. R. App. P. 29(a)(4)(E) and Local R. 29.1(b), *amici* state as follows: (1) no party's counsel authored the brief in whole or in part; (2) no party or party's counsel contributed money that was intended to fund preparing or submitting the brief; and (3) no person—other than *amici curiae*, their members or their counsel—contributed money intended to fund preparing or submitting the brief.

1

are concerned that, if this Court were to permit an injunction permanently preventing the publication of speech in this instance, such a precedent could be used to permanently enjoin the press from publishing information from a source on the basis of the source's agreements with other entities. The court below indicated the injunction was not a blanket prohibition on producing a film on a particular subject, but it effectively does serve as such when a contractually limited source is involved at any step of the process.

The injunction issued by the court below prohibiting Cleopatra from disseminating its film undermines one of the most deeply held constitutional values in our society—the prohibition on prior restraints—and threatens the news media's ability to report freely on matters of public concern.

## SOURCE OF AUTHORITY TO FILE

*Amici* have moved for leave to file this brief in the accompanying motion pursuant to Federal Rule of Appellate Procedure 29(a)(3).

## SUMMARY OF THE ARGUMENT

The injunction entered by the U.S. District Court for the Southern District of New York (the "district court") in this case imposes a prior restraint on publication, which has been described as "the most serious and the least tolerable infringement on First Amendment rights." *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976). The district court's injunction blocking Cleopatra from distributing its film based on a prior consent decree entered into by a third party violates a central tenet of the First Amendment: that while improper speech may be retrospectively punished, it cannot be prospectively prohibited.

It is well-established that the First Amendment protects motion pictures—whether fact or fiction—just as strongly as it does other forms of speech. Cleopatra's film "Street Survivors," about the 1977 plane crash involving the legendary rock band Lynyrd Skynyrd, is part of a tradition of dramatized narratives that both educate and inform the public. Some fictionalization in a film or work of art does not take that work out of the ambit of First Amendment protection.

Courts have regularly held prior restraints on First Amendment protected speech to an exacting standard, including when the gravest of public interests are at stake. Thus, the U.S. Supreme Court has rejected prior restraints on publication of information despite claims that publication would imperil national security or prejudice a criminal defendant's constitutional rights. *N.Y. Times Co. v. United*

3

*States*, 403 U.S. 713 (1971) (per curiam) (the "*Pentagon Papers*" case); *Neb. Press Ass'n v. Stuart*, 427 U.S. 539 (1976). The harms Plaintiffs-Appellees allege here are far less serious and do not justify a prior restraint.

In this case, a prior restraint in the form of an injunction is not the proper remedy, and, if left in place, threatens long-recognized First Amendment values. Even assuming *arguendo* that the 1988 consent decree applies to Cleopatra, the appropriate remedy for its violation would be an action for damages, not an injunction.

## ARGUMENT

**I.    The First Amendment fully protects films, including dramatizations like Cleopatra's "Street Survivors."**

The Supreme Court has made clear that motion pictures—whether fact or fiction—are squarely within the scope of the First Amendment.  *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495 (1952).  Undeniably, films that feature dramatized reenactments of past events play an important role in informing and entertaining the public.  "Street Survivors" follows in that tradition and falls within the ambit of the First Amendment.

Films are "a significant medium for the communication of ideas" entitled to full First Amendment protection, just like books, newspapers, and other forms of expressive communication.  *Burstyn*, 343 U.S. at 501.  The Supreme Court underscored that these constitutional protections are not diminished by the fact that the work may be properly labeled as "entertainment," noting that "[t]he importance of motion pictures as an organ of public opinion is not lessened by the fact that they are designed to entertain as well as to inform."  *Id*. at 501, 504 n.15; *accord Brown v. Entm't Merchants Ass'n*, 564 U.S. 786, 790 (2011) ("[W]e have long recognized that it is difficult to distinguish politics from entertainment, and dangerous to try."); *Winters v. New York*, 333 U.S. 507, 510 (1948) (explaining that both entertainment and news are fully protected by the First Amendment

5

because "[t]he line between the informing and the entertaining is too elusive for the protection of that basic right [of a free press]").

Following this rationale, courts across the country, including the Second Circuit and federal district courts within the Second Circuit, have held that the First Amendment protects all forms of expressive works, whether they be entirely fictional, semi-fictional, "based on" or "inspired by" real events and people, entirely factual news reporting, or documentaries. *See Meeropol v. Nizer*, 560 F.2d 1061, 1066–67 (2d Cir. 1977) (declaring that a fictionalized account of the Julius and Ethel Rosenberg trial was not actionable under misappropriation theory since both "historical" and "fictional" works are fully protected by the First Amendment); *Hicks v. Casablanca Records*, 464 F. Supp. 426, 433 (S.D.N.Y. 1978) (finding the use of the name and characteristics of Agatha Christie in a fictional film protected under the First Amendment); *see also, e.g.*, *Matthews v. Wozencraft*, 15 F.3d 432, 438 n.5, 440 (5th Cir. 1994) (holding that the First Amendment protects the use of a persona in a novel, including the plaintiff's "character, occupation and the general outline of his career, with many incidents in his life" (quoting W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 117 at 853 (5th ed. 1984)); *Seale v. Gramercy Pictures*, 949 F. Supp. 331, 337 (E.D. Pa. 1996) (concluding that the use of the plaintiff's persona in a dramatized film about the Black Panthers organization was protected expression); *Guglielmi v.*

6

*Spelling-Goldberg Prods.*, 603 P.2d 454, 459–61 (Cal. 1979) (finding constitutional protection for the unauthorized use of Rudolph Valentino's name and likeness in a semi-fictional movie); *Tyne v. Time Warner Entm't Co., L.P.*, 901 So.2d 802, 810 (Fla. 2005) (confirming full First Amendment protection for the film "The Perfect Storm," a dramatized account of the actual disappearance of a fishing vessel and crew during a powerful storm, and refusing to classify motion pictures as commercial speech); *Rosemont Enters. v. McGraw-Hill Book Co.*, 85 Misc.2d 583, 587 (N.Y. Sup. Ct. 1975) (holding that an unauthorized, fictionalized biography of Howard Hughes could not provide the basis for a misappropriation claim and noting that an individual "cannot have a monopoly, nor can he give a monopoly to any entity, with respect to works concerning his life").

Ultimately, the degree of dramatization in Cleopatra's film is not relevant to any First Amendment analysis. Some chronological details surrounding the 1977 plane crash are out of place. *See Ronnie Van Zant, Inc. v. Pyle*, No. 17 CIV. 3360 (RWS), 2017 WL 3721777, at *6 (S.D.N.Y. Aug. 28, 2017) (noting factual inaccuracies). However, it is well within the tradition of dramatized narratives, which often compress or distort time or combine characters for editorial reasons. These movies have been produced for decades and have entertained, inspired, and educated the viewing public by drawing on actual events and people. *See, e.g.*, *Alfano v. NGHT, Inc.*, 623 F. Supp. 2d 355, 359 (E.D.N.Y. 2009) (noting the

7

newsworthiness of "Inside the Mafia," a docudrama featuring the trial of John

Gotti, notwithstanding some deviance from the historical record since the

"activities of organized crime in the United States have long been a matter of

public interest, even fascination").

In recent years, there has been no shortage of movies or television series

that, as "Street Survivors" does, relate a historical tale with some immaterial

fictionalization. The FX television network's "The People v. O. J. Simpson:

American Crime Story" focused on the dramatic O. J. Simpson murder trial that

captured the nation's attention in 1995. The series won nine television Emmy

awards, including for Outstanding Limited Series. *The People v. O.J. Simpson:

American Crime Story*, Emmys, https://perma.cc/7LWU-85B6 (last visited Sept.

29, 2017). The film "Snowden" dramatized the story of former National Security

Agency contractor Edward Snowden's 2013 leak of classified government

information. The HBO-produced movie "Confirmation" reenacted the events

surrounding Clarence Thomas's 1991 Supreme Court nomination hearings,

including Anita Hill's allegations of sexual harassment by Thomas. All three of

these works were based on real events but included fictionalized elements to allow

for a more condensed and viewer-friendly script, and all were works that educated

as well as entertained the viewing public. For example, "The People v. O. J.

Simpson" offered new details and instructed a new generation on a subject still

8

very much in the public's consciousness, while "Snowden" helped personify and explain complicated questions our nation faces over privacy and national security.[2]

Like these works, "Street Survivors" intends to both entertain and educate viewers. The film sheds light on a past event that remains an important part of popular American culture. It is based on the historical record and is, at bottom, a work of combined art and nonfiction. No matter how they are characterized, films like "Street Survivor" have long been protected by the First Amendment. Most important, "Street Survivor," like other dramatizations, is of significant value to the public.

## II. Prior restraint of speech is unconstitutional in all but the rarest of circumstances.

Given that "Street Survivors" is fully protected by the First Amendment, "[a]ny system of prior restraints of [such] expression comes to this Court bearing a heavy presumption against its constitutional validity." *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963). Indeed, "Prior restraints on speech and publication are the most serious and the least tolerable infringement on First Amendment rights," and "one of the most extraordinary remedies known to our

---

[2] "The King's Speech," "The Blind Side," "Erin Brockovich," "The Perfect Storm," "The Social Network," and "Steve Jobs" are just a few other recent critically-acclaimed films based on real-life people and events.

jurisprudence." *Neb. Press Ass'n*, 427 U.S. at 559, 562. There is a "deep-seated American hostility to prior restraints." *Id.* at 589 (Brennan, J., concurring).

An injunction like the one issued by the district court against Cleopatra is clearly a prior restraint on the publication of speech. "The term prior restraint is used 'to describe administrative and judicial orders forbidding certain communications when issued in advance of the time that such communications are to occur.'" *Alexander v. United States*, 509 U.S. 544, 550 (1993) (quoting M. Nimmer, Nimmer on Freedom of Speech § 4.03, p. 4–14 (1984)). "[P]ermanent injunctions . . . are classic examples of prior restraints." *Id.* Here, the district court issued a judicial order that preemptively and permanently blocks Cleopatra from releasing its original motion picture. The injunction is a clear instance of a judicial prior restraint.

The lessons of history and American jurisprudence overwhelmingly warn against permitting prior restraints because they are hostile to the First Amendment guarantees of free speech and a free press. Therefore, the district court improperly granted the injunction when, assuming *arguendo* that Cleopatra was bound by the consent decree and violated it, a damages suit after the publication of the movie would have been the proper remedy.

10

A.    Prior restraints directly contravene the First Amendment's purpose and history of protecting expressive speech.

As Chief Justice Hughes wrote for the Supreme Court in *Near v. Minnesota ex rel. Olson*, "[I]t is the chief purpose of the [First Amendment] guaranty to prevent previous restraints upon publication."  283 U.S. 697, 713 (1931).  This purpose is evident from the historical context of the First Amendment.

Historically, the aversion to prior restraints originates from America's English roots.  Blackstone, in his influential 1760s common law treatise, summarized the law in England as follows:

> The liberty of the press is indeed essential to the nature of a free state; but this consists in laying no *previous* restraints upon publications, and not in freedom from censure for criminal matter when published.  Every free man has an undoubted right to lay what sentiments he pleases before the public; to forbid this, is to destroy the freedom of the press; but if he publishes what is improper, mischievous or illegal, he must take the consequences of his own temerity.

4 William Blackstone, Commentaries 151–52.  This English principle found support in America even before the Bill of Rights was ratified.  During the drafting of the Constitution, Federalists "sought to reassure Anti-Federalist critics by insisting that the new federal government would have no generally applicable enumerated power to censor or license the press." Akhil Reed Amar, *How America's Constitution Affirmed Freedom of Speech Even Before the First*

11

*Amendment*, 38 Cap. U. L. Rev. 503, 506 (2010) (citation omitted).

Early cases in the United States also reflected the understanding that the First Amendment meant, if nothing else, that information should be freely published without prior restraint. *See, e.g.*, *Commonwealth v. Blanding*, 20 Mass. 304, 313–14 (1825) (finding that the constitutional free press right "was intended to prevent all such previous restraints upon publications as had been practiced by other governments"); *Patterson v. Colorado*, 205 U.S. 454, 462 (1907) (quoting *Blanding*, 20 Mass. at 313–14); *Brandreth v. Lance*, 8 Paige Ch. 24, 26 (N.Y. Ch. 1839) (refusing to enjoin the publication of a libelous pamphlet because it could not be done "without infringing upon the liberty of the press, and attempting to exercise a power of preventive justice which . . . cannot safely be entrusted to any tribunal consistently with the principles of a free government").

To be sure, the long history of the First Amendment has included substantial debate and disagreement about the scope of its protections. *See* Ashutosh Bhagwat, *Posner, Blackstone, and Prior Restraints on Speech*, 2015 B.Y.U. L. Rev. 1151, 1170 (2015) (describing the "overwhelming impression" of First Amendment history as "one of confusion and uncertainty"). But throughout this debate, freedom from prior restraints was considered the First Amendment's bedrock principle. "There was . . . widespread consensus on at least one critical principle: Liberty of the press must mean, at a bare minimum, no prior restraint."

12

Michael Meyerson, *The Neglected History of the Prior Restraint Doctrine: Rediscovering the Link Between the First Amendment and the Separation of Powers*, 34 Ind. L. Rev. 295, 320–21 (2001).

> B.    The Supreme Court has regularly rejected prior restraints, with only very limited exceptions.

The Supreme Court relied on this historical context in *Near v. Minn. ex. rel. Olson*, when it expressly stated, for the first time, that prior restraints are subject to a demanding standard.  *See* 283 U.S. at 713 (citing Blackstone's Commentaries for the proposition that "the liberty of the press . . . consists in laying no previous restraints upon publications").  In *Near*, the Court considered a Minnesota law that allowed the government to enjoin the publication of a "malicious, scandalous and defamatory newspaper."  *Id.* at 705.  Recognizing the "exceptional nature of [prior restraint's] limitations," the Court declared that the statute "impose[d] an unconstitutional restraint upon publication."  *Id.* at 716, 723.  Writing for the majority, Chief Justice Hughes offered some hypotheticals in which prior restraints may be acceptable:

> No one would question but that a government might prevent actual obstruction to its recruiting service or the publication of the sailing dates of transports or the number and location of troops.  On similar grounds, . . . [t]he security of the community life may be protected against incitements to acts of violence and the overthrow by force of orderly government.  The constitutional guaranty of free speech does not protect a man from an

13

injunction against uttering words that may have all the effect of force.

*Id.* at 716 (citation and quotation marks omitted).

Even when confronted with strong interests in support of prior restraints, the Supreme Court has rejected them. In the seminal *Pentagon Papers* case, for example, the government sought an injunction prohibiting *The New York Times* and *The Washington Post* from publishing classified documents concerning the Vietnam War. *Pentagon Papers*, 403 U.S. at 714. Top government officials claimed that the publication of the documents would harm both the war and peace efforts in Vietnam and imperil national security. *Id.* Nonetheless, the Court refused to enjoin the protected speech. *Id.*

Although the Court's per curiam opinion did not explain the precise reasons for refusing to grant an injunction, the concurring opinions of several Justices made clear that they were skeptical of prior restraints in all but the most dire circumstances. For example, Justice Stewart, joined by Justice White, wrote that a prior restraint on publication was unconstitutional unless the disclosures would "surely result in direct, immediate, and irreparable damage to our Nation or its people." *Id.* at 730 (Stewart, J., joined by White, J., concurring). Justice Brennan wrote that there is at most "a single, extremely narrow class of cases in which the First Amendment's ban on prior judicial restraint may be overridden," *i.e.,* wartime

14

censorship to shield information about, *inter alia*, "the number and location of troops." *Id.* at 726 (Brennan, J., concurring). In fact, Justice Brennan concluded that even if the government sought to suppress "information that would set in motion a nuclear holocaust," the government would be required to allege or present facts showing that publication of the information at issue "would cause the happening of an event of that nature." *Id*.

Similarly, in *Nebraska Press Association v. Stuart*, the Court rejected a gag on publication of information that might have been prejudicial to a defendant's fair trial. 427 U.S. at 570. Despite claims that the defendant's constitutional rights were infringed, the press and the public's interest against prior restraints prevailed. *Id.* at 543. The Court recognized that the defendant's trial would likely generate "intense and pervasive pretrial publicity," but it found he had not overcome the high barriers necessary to justify a prior restraint. *Id.* at 562–63, 570.

Only in very limited circumstances will courts apply a less stringent application of the First Amendment to prior restraints. Those situations have involved a time, place, and manner restriction; a licensing regime; or speech that is not fully protected by the First Amendment, such as commercial speech or obscenity. *See, e.g.*, *Thomas v. Chi. Park Dist.*, 534 U.S. 316, 322–23 (2002) (imposing a time, place, and manner restriction); *Freedman v. Maryland*, 380 U.S. 51, 58–60 (1965) (applying a less strict test to a licensing regime reviewing films

15

to determine if they were moral and proper); *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 571 n.13 (1980) (stating that in cases of commercial speech and obscenity, the traditional prior restraint doctrine will not apply); *Kingsley Books v. Brown*, 354 U.S. 436, 441 (1957) (upholding a "closely confined" injunction on obscene booklets).  None of these exceptions apply in the case of the injunction against "Street Survivor."

    *Pentagon Papers* and the other Supreme Court cases in no uncertain terms demonstrate that "prior restraints of expression" face a "heavy presumption" of unconstitutionality.  *Bantam Books*, 372 U.S. at 70; *accord United States v. Quattrone,* 402 F.3d 304, 310 (2d Cir. 2005) (noting that "courts subject prior restraints on speech or publication to exacting review" when the restraint operates on core First Amendment speech).  This longstanding presumption against prior restraints has served as "a virtually insurmountable barrier," *Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241, 259 (1974) (White, J., concurring) and should guide this Court's analysis of the prior restraint imposed by the district court on "Street Survivor."

    C.    Even if Cleopatra is bound by the consent decree, the proper remedy is an action for damages, not a prior restraint.

    At the foundation of the Supreme Court's prior restraint jurisprudence is one basic principle: it is better to punish a speaker for improper speech after it is

16

expressed than to prevent the speaker from speaking at all. While "a threat of criminal or civil sanctions after publication 'chills' speech, prior restraint 'freezes' it." *Neb. Press Ass'n*, 427 U.S. at 559. Assuming *arguendo* that Cleopatra is bound by the consent decree and violated it, an action for damages—not an injunction—would be the proper contractual remedy for the Plaintiffs-Appellees. *See Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 794 n.1 (1994) (Scalia, J., concurring in part and dissenting in part) ("I know of no authority for the proposition that restriction of speech, rather than fines or imprisonment, should be the sanction for misconduct.").

The presumption against prior restraints is based on the principle that "a free society prefers to punish the few who abuse the rights of speech *after* they break the law than to throttle them and all others beforehand." *Vance v. Universal Amusement Co., Inc.*, 445 U.S. 308, 316 n.13 (1980) (per curiam). The Court has called prior restraints the "most extraordinary remedy," available "only where the evil that would result from the reportage is both great and certain and cannot be mitigated by less intrusive measures." *CBS Inc. v. Davis*, 510 U.S. 1315, 1317 (1994) (internal quotations, alterations, and citation omitted). Even in the important realm of national security, this axiom remains true. *See Pentagon Papers*, 403 U.S. at 714 (finding that the government had not met the "heavy burden" of justifying a prior restraint).

17

This case does not invoke any of the extraordinary exceptions to prior restraint doctrine based on imminent public danger. Instead, Plaintiffs-Appellees primarily seek to protect their alleged commercial and reputational interests. This "evil" certainly *can* "be mitigated by less intrusive measures"—namely, an action for damages. *See Davis*, 510 U.S. at 1317.

Indeed, courts have consistently rejected prior restraints in cases raising similar tort claims. *See Org. for a Better Austin v. Keefe*, 402 U.S. 415, 419–20 (1971) (reversing an injunction, based on an invasion of privacy claim, prohibiting dissemination of leaflets describing the plaintiff's business practices); *In re King World Prods., Inc.*, 898 F.2d 56, 59 (6th Cir. 1990) (denying an injunction, based on invasion of privacy and other claims, preventing a news program from airing surreptitious video of the plaintiff doctor's alleged malpractice because, "[n]o matter how inappropriate the acquisition, or its correctness, the right to disseminate that information is what the Constitution intended to protect"); *Rombom v. Weberman*, 309 A.D.2d 844, 845 (N.Y. App. Div. 2003) ("Absent extraordinary circumstances, injunctive relief should not be issued in defamation cases[.]").

The injunction against Cleopatra is a judicial suppression of future speech. A less intrusive remedy is available to address Cleopatra's alleged wrongdoings, and the prior restraint is unconstitutional and should be rejected.

18

## CONCLUSION

For the foregoing reasons and the reasons set forth in Cleopatra's brief,

*amici* respectfully request that the Court reverse the district court's order.

Respectfully submitted,

<u>/s/ Bruce D. Brown</u>
Bruce D. Brown
 *Counsel of Record*
Gregg Leslie
Caitlin Vogus
THE REPORTERS COMMITTEE FOR
 FREEDOM OF THE PRESS
1156 15th St. NW, Suite 1250
Washington, D.C. 20005
Phone: (202) 795-9300
Fax: (202) 795-9310
bbrown@rcfp.org

*Additional counsel for *amici* are
listed in Appendix B.

Dated:  October 6, 2017
    Washington, D.C.

19

## CERTIFICATE OF COMPLIANCE WITH RULE 32(G)

I, Bruce D. Brown, do hereby certify that the foregoing brief of *amici curiae*:

1) Complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and L. Civil R. 29.1 because it contains 3,977 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), as calculated by the word-processing system used to prepare the brief; and

2) Complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Office Word in 14-point, Times New Roman font.

/s/  Bruce D. Brown
Bruce D. Brown, Esq.
*Counsel of Record*
THE REPORTERS COMMITTEE
FOR FREEDOM OF THE PRESS

Dated:     October 6, 2017
              Washington, D.C.

20

# APPENDIX A

## SUPPREMENTAL STATEMENT OF IDENTITY OF *AMICI CURIAE*

**The Reporters Committee for Freedom of the Press** is a voluntary, unincorporated association of reporters and editors that works to defend the First Amendment rights and freedom of information interests of the news media. The Reporters Committee has provided representation, guidance and research in First Amendment and Freedom of Information Act litigation since 1970.

With some 500 members, **American Society of News Editors** ("ASNE") is an organization that includes directing editors of daily newspapers throughout the Americas. ASNE changed its name in April 2009 to American Society of News Editors and approved broadening its membership to editors of online news providers and academic leaders. Founded in 1922 as American Society of Newspaper Editors, ASNE is active in a number of areas of interest to top editors with priorities on improving freedom of information, diversity, readership and the credibility of newspapers.

**The Associated Press Media Editors** is a nonprofit, tax-exempt organization of newsroom leaders and journalism educators that works closely with The Associated Press to promote journalism excellence. APME advances the principles and practices of responsible journalism; supports and mentors a diverse

21

network of current and emerging newsroom leaders; and champions the First Amendment and promotes freedom of information.

**Association of Alternative Newsmedia** ("AAN") is a not-for-profit trade association for 130 alternative newspapers in North America, including weekly papers like The Village Voice and Washington City Paper. AAN newspapers and their websites provide an editorial alternative to the mainstream press. AAN members have a total weekly circulation of seven million and a reach of over 25 million readers.

**The Association of American Publishers, Inc.** ("AAP") is the national trade association of the U.S. book publishing industry. AAP's members include most of the major commercial book publishers in the United States, as well as smaller and nonprofit publishers, university presses and scholarly societies. AAP members publish hardcover and paperback books in every field, educational materials for the elementary, secondary, postsecondary and professional markets, scholarly journals, computer software and electronic products and services. The Association represents an industry whose very existence depends upon the free exercise of rights guaranteed by the First Amendment.

**Discovery Communications LLC** satisfies curiosity and engages superfans with a portfolio of premium nonfiction, sports and kids programming brands. Reaching 3 billion cumulative viewers across pay-TV and free-to-air platforms in

22

more than 220 countries and territories, Discovery's portfolio includes the global brands Discovery Channel, TLC, Investigation Discovery, Animal Planet, Science and Turbo/Velocity, as well as OWN: Oprah Winfrey Network in the U.S., Discovery Kids in Latin America, and Eurosport, the leading provider of locally relevant, premium sports content across Europe. Discovery reaches audiences across screens through digital platforms, as well as over-the-top and TV Everywhere offerings, including Eurosport Player, Dplay, Discovery K!ds Play and Discovery GO.

**Dow Jones & Company, Inc.**, is a global provider of news and business information, delivering content to consumers and organizations around the world across multiple formats, including print, digital, mobile and live events. Dow Jones has produced unrivaled quality content for more than 130 years and today has one of the world's largest newsgathering operations globally. It produces leading publications and products including the flagship Wall Street Journal; Factiva; Barron's; MarketWatch; Financial News; Dow Jones Risk & Compliance; Dow Jones Newswires; and Dow Jones VentureSource.

**First Amendment Coalition** is a nonprofit public interest organization dedicated to defending free speech, free press and open government rights in order to make government, at all levels, more accountable to the people. The Coalition's mission assumes that government transparency and an informed electorate are

23

essential to a self-governing democracy. To that end, we resist excessive
government secrecy (while recognizing the need to protect legitimate state secrets)
and censorship of all kinds.

**First Look Media Works, Inc.** is a new non-profit digital media venture
that produces The Intercept, a digital magazine focused on national security
reporting.

**The International Documentary Association** (IDA) is dedicated to
building and serving the needs of a thriving documentary culture. Through its
programs, the IDA provides resources, creates community, and defends rights and
freedoms for documentary artists, activists, and journalists.

**The Investigative Reporting Workshop**, a project of the School of
Communication (SOC) at American University, is a nonprofit, professional
newsroom. The Workshop publishes in-depth stories at
investigativereportingworkshop.org about government and corporate
accountability, ranging widely from the environment and health to national
security and the economy.

**MPA – The Association of Magazine Media**, ("MPA") is the largest
industry association for magazine publishers. The MPA, established in 1919,
represents over 175 domestic magazine media companies with more than 900
magazine titles. The MPA represents the interests of weekly, monthly and

24

quarterly publications that produce titles on topics that cover politics, religion, sports, industry, and virtually every other interest, avocation or pastime enjoyed by Americans.  The MPA has a long history of advocating on First Amendment issues.

**The National Press Photographers Association** ("NPPA") is a 501(c)(6) non-profit organization dedicated to the advancement of visual journalism in its creation, editing and distribution.  NPPA's approximately 7,000 members include television and still photographers, editors, students and representatives of businesses that serve the visual journalism industry.  Since its founding in 1946, the NPPA has vigorously promoted the constitutional rights of journalists as well as freedom of the press in all its forms, especially as it relates to visual journalism. The submission of this brief was duly authorized by Mickey H. Osterreicher, its General Counsel.

**The Tully Center for Free Speech** began in Fall, 2006, at Syracuse University's S.I. Newhouse School of Public Communications, one of the nation's premier schools of mass communications.

# APPENDIX B

## ADDITIONAL COUNSEL FOR *AMICI CURIAE*

Kevin M. Goldberg
Fletcher, Heald & Hildreth, PLC
1300 N. 17th St., 11th Floor
Arlington, VA 22209
*Counsel for American Society of News Editors*
*Counsel for Association of Alternative Newsmedia*

Jonathan Bloom
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
*Counsel for The Association of American Publishers, Inc.*

Savalle Sims, Exec. V.P., Deputy Gen. Counsel
Leah Montesano, V.P., Litigation
Discovery Communications, LLC
One Discovery Place
Silver Spring, Maryland 20910

Jason P. Conti
Jacob P. Goldstein
Dow Jones & Company, Inc.
1211 Avenue of the Americas
New York, NY 10036
*Counsel for Dow Jones & Company, Inc.*

David Snyder
First Amendment Coalition
534 Fourth St., Suite B
San Rafael, CA 94901

First Look Media Works, Inc.
18th Floor
114 Fifth Avenue
New York, NY 10011

James Cregan
Executive Vice President
MPA – The Association of Magazine Media
1211 Connecticut Ave. NW
Suite 610
Washington, DC 20036

Mickey H. Osterreicher
1100 M&T Center, 3 Fountain Plaza,
Buffalo, NY 14203
*Counsel for National Press Photographers Association*

26

**CERTIFICATE OF SERVICE**

I, Bruce D. Brown, do hereby certify that I have filed the foregoing Brief of *Amici Curiae* electronically with the Clerk of the Court for the United States Court of Appeals for the Second Circuit using the appellate CM/ECF system on October 6, 2017.

I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ Bruce D. Brown
Bruce D. Brown, Esq.
*Counsel of Record*
THE REPORTERS COMMITTEE
FOR FREEDOM OF THE PRESS

27