**UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT**

**Thurgood Marshall U.S. Courthouse   40 Foley Square, New York, NY 10007 Telephone: 212-857-8500**

**MOTION INFORMATION STATEMENT**

**Docket Number(s):** 17-2849

_____   Caption [use short title]

**Motion for:** Amici Curiae A&E Television Networks, LLC, Home Box Office, Inc, Metro-Goldwyn-Mayer Studios Inc.

NBCUniversal Media, LLC, Paramount Pictures Corp., Sony Pictures Entertainment Inc., Twentieth

Century Fox Film Corporation, Univision Communications Inc., Warner Brothers Entertainment Inc.

Set forth below precise, complete statement of relief sought:

The amici identified above respectfully seek leave to

to file an amicus curiae brief on behalf of

Defendants-Appellants urging reversal

pursuant to Fed. R. App. P. 29(a).

**Ronnie Van Zant, Inc. v. Artimus Pyle**

**MOVING PARTY:** Amici Curiae (as identifed above)     **OPPOSING PARTY:** Ronnie Van Zant, Inc., et al.

☐ Plaintiff   ☐ Defendant

☐ Appellant/Petitioner   ☐ Appellee/Respondent

**MOVING ATTORNEY:** Nathan Siegel, Esq.     **OPPOSING ATTORNEY:** Richard G. Haddad, Esq.

[name of attorney, with firm, address, phone number and e-mail]

Davis Wright Tremaine LLP                    Otterbourg P.C.

1251 Avenue of the Americas, 21st Fl., New York, NY 10020     230 Park Avenue, 29th Fl., New York, NY 10169

(212) 489-8230, nathansiegel@dwt.com          (212) 661-9100, rhaddad@otterbourg.com

Court- Judge/ Agency appealed from: United States District Court for the Southern District of New York, D.J. Sweet

**Please check appropriate boxes:**

Has movant notified opposing counsel (required by Local Rule 27.1):
☑ Yes   ☐ No (explain):_____
_____

Opposing counsel's position on motion:
☐ Unopposed  ☑ Opposed  ☐ Don't Know
Does opposing counsel intend to file a response:
☐ Yes   ☐ No  ☑ Don't Know

**FOR EMERGENCY MOTIONS, MOTIONS FOR STAYS AND INJUNCTIONS PENDING APPEAL:**

Has this request for relief been made below?   ☐ Yes ☐ No
Has this relief been previously sought in this court?  ☐ Yes ☐ No
Requested return date and explanation of emergency:  _____
_____
_____
_____
_____

Is oral argument on motion requested?  ☐ Yes ☑ No (requests for oral argument will not necessarily be granted)

Has argument date of appeal been set?  ☐ Yes ☑ No  If yes, enter date:_____

**Signature of Moving Attorney:**

/s/ Nathan Siegel_____   **Date:** 10/6/2017_____   Service by: ☑ CM/ECF  ☐ Other [Attach proof of service]

Form T-1080 (rev.12-13)

# 17-2849

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

---

RONNIE VAN ZANT, INC., GARY R. ROSSINGTON, JOHNNY VAN VANT, BARBARA HOUSTON, as the Trustee of the ALLEN COLLINS TRUST, and ALICIA RAPP and CORINNA GAINES BIEMILLER, as the Personal Representatives of the Estate of STEVEN GAINES,
Plaintiffs-Appellees,

v.

CLEOPATRA RECORDS, INC., and CLEOPATRA FILMS,
a division of CLEOPATRA RECORDS, INC.,
Defendants-Appellants.

ARTIMUS PYLE (a/k/a THOMAS D. PYLE), JOHN DOE, JANE DOE, XYZ CORPORATION, AND XYZ LLC (the names of the last four defendants being fictitious and unknown to plaintiffs, and intended to be designate persons or entities that have or may have a role in the production and distribution of the Motion Picture complained of in the Complaint herein),
Defendants.

---

On Appeal from the United States District Court
for the Southern District of New York

---

**MOTION OF *AMICI CURIAE* A&E TELEVISION NETWORKS, LLC, HOME BOX OFFICE, INC., METRO-GOLDWYN-MAYER STUDIOS INC., NBCUNIVERSAL MEDIA, LLC, PARAMOUNT PICTURES CORPORATION, SONY PICTURES ENTERTAINMENT INC., TWENTIETH CENTURY FOX FILM CORPORATION, UNIVISION COMMUNICATIONS INC., WARNER BROS. ENTERTAINMENT INC. FOR LEAVE TO FILE AMICUS CURIAE BRIEF IN SUPPORT OF DEFENDANTS-APPELLANTS URGING REVERSAL**

---

Nathan Siegel, Esq.
L. Danielle Toaltoan, Esq.
Counsel of Record
DAVIS WRIGHT TREMAINE
1251 Avenue of the Americas, 21st Fl.
New York, NY 11201
Telephone: (212) 489-8230
Facsimile: (212) 489-8340

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rules 29(c) and 26.1 of the Federal Rules of Appellate

Procedure, *amici* provide the following disclosures of corporate identity:

A&E Television Networks, LLC ("A+E Networks®") is an award-winning,

global media content company offering consumers a diverse communications

environment ranging from linear channels to websites, gaming, watch apps and

educational software. A+E Networks® is comprised of A&E®, Lifetime®,

HISTORY®, Lifetime Movies, FYI™ and VICELAND®, as well as its own long-

form production division A+E Studios™; film division, A&E IndieFilms®; A+E

Networks Digital®; digital storytelling hub, 45th & Dean™; strategic investment

division, A+E Ventures™; and A+E Networks Consumer Products™. A+E

Networks' channels and branded programming reach more than 335 million

households in over 200 territories. A&E Networks® is a limited liability company

with interests held by five entities, three of which own more than 10%: (1) Hearst

Communications, Inc., the ultimate parent of which is The Hearst Corporation,

which is not publicly traded; (2) Hearst Holdings, Inc., the ultimate parent of

which is The Hearst Corporation, which is not publicly traded; and (3)

Disney/ABC International Television, Inc., whose ultimate parent company is The

Walt Disney Company, which is publicly traded.  A&E Networks® does not own

10% or more of the outstanding shares of any publicly-owned company.

1

Home Box Office, Inc. ("HBO") is a New York-based company that provides HBO and Cinemax branded television services to more than 134 million subscribers worldwide. HBO produces and licenses critically-acclaimed HBO original programming to television networks in over 150 countries, including series, mini-series and films, which often take viewers behind the scenes of some of the most important events in recent history. HBO is a subsidiary of Time Warner Company, which is publicly-traded. No other publicly-traded corporation owns more than 10% of HBO.

Metro-Goldwyn-Mayer Studios Inc. ("MGM") is a leading entertainment company focused on the production and global distribution of film and television content across all platforms. The company owns one of the world's deepest libraries of premium film and television content as well as the premium pay television network EPIX. MGM is an indirect, wholly-owned subsidiary of MGM Holdings Inc., a privately held company. No publicly held corporation owns 10% or more of MGM's stock.

NBCUniversal Media, LLC ("NBCUniversal") is one of the world's leading media and entertainment companies in the development, production, and marketing of entertainment, news and information to a global audience. NBCUniversal owns and operates a valuable portfolio of news and entertainment television networks, a premier motion picture company, significant television production operations, a

2

leading television stations group, world-renowned theme parks, and a suite of leading Internet-based businesses. NBCUniversal is a subsidiary of Comcast Corporation, which is publicly traded.  No other publicly-traded corporation owns more than 10% of NBCUniversal.

Paramount Pictures Corporation ("Paramount") is an American film studio based in Hollywood, California.  Paramount is the fifth oldest surviving film studio in the world and the second oldest in the United States.   Paramount is a subsidiary of Viacom, which is publicly-traded.  No other publicly-traded corporation owns more than 10% of Paramount.

Sony Pictures Entertainment ("SPE") is a subsidiary of Sony Entertainment Inc., which is a subsidiary of Sony Corporation, which is publicly-traded.   SPE's global operations encompass motion picture production, acquisition, and distribution; television production, acquisition, and distribution; television networks; digital content creation and distribution; operation of studio facilities; and development of new entertainment products, services and technologies. SPE's Motion Picture Group includes film labels Columbia Pictures, Screen Gems, TriStar Pictures, Sony Pictures Animation, and Sony Pictures Classics.  No other publicly-traded corporation owns more than 10% of SPE.

Twentieth Century Fox Film Corporation ("TCFFC") is one of the world's largest producers and distributors of motion pictures, producing and distributing

motion pictures throughout the world under a variety of arrangements. Through

various units, TCFFC produces and/or distributes motion pictures for mainstream

audiences, specialized motion pictures, and feature length animated motion

pictures. TCFFC is an indirect subsidiary of Twenty-First Century Fox, Inc.,

which is publicly-traded. No other publicly-traded corporation owns more than

10% of TCFFC.

Univision Communications Inc. ("UCI") is the leading media company

serving Hispanic America. UCI is a leading content creator in the U.S. and

includes the Univision Network, UniMás and Univision Cable Networks. UCI also

includes the Fusion Media Group, a division that serves young, diverse audiences,

which includes cable networks and a collection of leading digital brands including

Gizmodo, Deadspin and Jezebel. No publicly-traded corporation owns more than

10% of UCI's stock.

Warner Bros. Entertainment Inc. ("Warner Bros.") is a global leader in all

forms of entertainment and their related businesses across all current and emerging

media and platforms. A Time Warner Company, the fully integrated, broad-based

Warner Bros. is home to one of the most successful collections of brands in the

world and stands at the forefront of every aspect of the entertainment industry from

feature film, television and home entertainment production and worldwide

distribution to DVD and Blu-ray, digital distribution, animation, comic books,

4

video games, product and brand licensing, and broadcasting. Warner Bros. is a subsidiary of Time Warner, which is publicly-traded. No other publicly-traded corporation owns more than 10% of Warner Bros.

## MOTION FOR LEAVE TO FILE BRIEF OF AMICI CURIAE

Proposed *amici curiae* A&E Television Networks, LLC, Home Box Office, Inc., Metro-Goldwyn-Mayer Studios Inc., NBCUniversal Media, LLC, Paramount Pictures Corporation, Sony Pictures Entertainment Inc., Twentieth Century Fox Film Corporation, Univision Communications Inc. and Warner Bros. Entertainment Inc. hereby move pursuant to Rule 29(a)(3) of the Federal Rules of Appellate Procedure for leave to file the *amicus curiae* brief attached as Exhibit A.[1]

These *amici* include movie studios and television networks, which are among the leading producers and distributors of audiovisual entertainment and information, including movies, television and radio programs, numerous forms of digital entertainment and documentaries. These *amici* have produced and disseminated countless movies, television programs, and documentaries that depict, or dramatize, significant historical events and personalities, including films much like Defendants-Appellants' film, that was enjoined by the District Court.

*Amici* are therefore deeply familiar with, and maintain an abiding interest in, the First Amendment protections afforded creators of films and television programs, which provide the foundation they rely upon to entertain, educate and

---

[1] Pursuant to Rule 32(4)(d), no party's counsel authored this brief in whole or in part, and no party, party's counsel, or person other than the *amici curiae* contributed money to fund preparing or submitting this brief.

inspire audiences around the globe.  The creation of a movie, television mini-series or documentary necessitates the investment of enormous time and resources.  All of these *amici* have been threatened with litigation because people did not like what a film or program portrayed, or because they claimed a right to control its content.  Yet to *amici*'s knowledge, outside the context of intellectual property disputes and, in decades' past, the regulation of obscenity, no appellate court has *ever* affirmed a prior restraint of a motion picture.  If this Court were to adopt the District Court's unprecedented and unconstitutional view of the prior restraint doctrine, it would significantly chill the willingness of content creators to undertake the comprehensive research necessary to create high-quality films, television programs and documentaries that depict real people and events.

Given the stakes of this case, these *amici* have a strong interest in – and are particularly well-situated – to provide the Court with insight into the importance of the Defendants-Appellants' First Amendment rights.  This brief also seeks to provide the Court with practical information about the nature of producing historically-based films and television programs, which speaks directly to the real-world ramifications of the District Court's decision, but is not likely to be addressed by the parties' briefs on the merits.  For these reasons, set forth in more

detail in the attached brief, *amici* respectfully request that this Court grant its motion to file the attached *amicus curiae* brief.[2]

Respectfully submitted,

DAVIS WRIGHT TREMAINE LLP

NATHAN SIEGEL
L. DANIELLE TOALTOAN

By____/s/ Nathan Siegel_____
        Nathan Siegel

1251 Avenue of the Americas, 21st Fl.
New York, NY 11201
Telephone: (212) 489-8230
Facsimile: (212) 489-8340

*Attorneys for Amici Curiae*

---

[2] This motion is being filed consistent with the requirements of F.R.A.P. 32(6), which provides that an amicus curiae must file its motion and brief no later than 7 days after the principal brief of the party being supported is filed.

# EXHIBIT A

# 17-2849-cv

## United States Court of Appeals

### *for the*

## Second Circuit

———————◆———————

ABC,

*Plaintiff,*

RONNIE VAN ZANT, INC., GARY R. ROSSINGTON, JOHNNY VAN ZANT,
BARBARA HOUSTON, as the Trustee of the ALLEN COLLINS TRUST,

*(For Continuation of Caption See Inside Cover)*

———————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

**BRIEF OF *AMICI CURIAE* A&E TELEVISION NETWORKS, LLC,
HOME BOX OFFICE, INC., METRO-GOLDWYN-MAYER
STUDIOS INC., NBCUNIVERSAL MEDIA, LLC, PARAMOUNT
PICTURES CORPORATION, SONY PICTURES
ENTERTAINMENT INC., TWENTIETH CENTURY FOX FILM
CORPORATION, WARNER BROS. ENTERTAINMENT INC. AND
UNIVISION COMMUNICATIONS INC. IN SUPPORT OF
DEFENDANTS-APPELLANTS**

NATHAN SIEGEL, ESQ.
L. DANIELLE TOALTOAN, ESQ.
DAVIS WRIGHT TREMAINE LLP
*Attorneys for Amici Curiae A&E Television Networks,
LLC, Home Box Office, Inc., Metro-Goldwyn-
Mayer Studios Inc., NBCUniversal Media, LLC,
Paramount Pictures Corporation, Sony Pictures
Entertainment Inc., Twentieth Century Fox Film
Corporation, Warner Bros. and Univision
Communications Inc. Entertainment Inc. in Support
of Defendants-Appellants*
1251 Avenue of the Americas, 21st Floor
New York, New York 10020
(212) 489-8230

ALICIA RAPP, as the Personal Representative of the Estate of
STEVEN GAINES, CORINNA GAINES BIEMILLER,
as the Personal Representative of the Estate of STEVEN GAINES,

*Plaintiffs-Appellees,*

– v. –

CLEOPATRA RECORDS, INC, CLEOPATRA FILMS,
a division of Cleopatra Records, Inc,

*Defendants-Appellants,*

DEF, ARTIMUS PYLE, AKA Thomas D. Pyle, JOHN DOE, JANE DOE,
XYZ CORPORATION, XYZ LLZ, (the names of the last four defendants being
fictitious and unknown to plaintiffs, and intended to be designate persons or
entities that have or may have a role in the production and distribution of the
Motion Picture compained of in the Complaint herein),

*Defendants.*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rules 29(c) and 26.1 of the Federal Rules of Appellate Procedure, *amici* provide the following disclosures of corporate identity:

A&E Television Networks, LLC ("A+E Networks®") is an award-winning, global media content company offering consumers a diverse communications environment ranging from linear channels to websites, gaming, watch apps and educational software. A+E Networks® is comprised of A&E®, Lifetime®, HISTORY®, Lifetime Movies, FYI™ and VICELAND®, as well as its own long-form production division A+E Studios™; film division, A&E IndieFilms®; A+E Networks Digital®; digital storytelling hub, 45th & Dean™; strategic investment division, A+E Ventures™; and A+E Networks Consumer Products™. A+E Networks' channels and branded programming reach more than 335 million households in over 200 territories. A&E Networks® is a limited liability company with interests held by five entities, three of which own more than 10%: (1) Hearst Communications, Inc., the ultimate parent of which is The Hearst Corporation, which is not publicly traded; (2) Hearst Holdings, Inc., the ultimate parent of which is The Hearst Corporation, which is not publicly traded; and (3) Disney/ABC International Television, Inc., whose ultimate parent company is The Walt Disney Company, which is publicly traded. A&E Networks® does not own 10% or more of the outstanding shares of any publicly-owned company.

i

Home Box Office, Inc. ("HBO") is a New York-based company that provides HBO and Cinemax branded television services to more than 134 million subscribers worldwide. HBO produces and licenses critically-acclaimed HBO original programming to television networks in over 150 countries, including series, mini-series and films, which often take viewers behind the scenes of some of the most important events in recent history. HBO is a subsidiary of Time Warner Company, which is publicly-traded. No other publicly-traded corporation owns more than 10% of HBO.

Metro-Goldwyn-Mayer Studios Inc. ("MGM") is a leading entertainment company focused on the production and global distribution of film and television content across all platforms. The company owns one of the world's deepest libraries of premium film and television content as well as the premium pay television network EPIX. MGM is an indirect, wholly-owned subsidiary of MGM Holdings Inc., a privately held company. No publicly held corporation owns 10% or more of MGM's stock.

NBCUniversal Media, LLC ("NBCUniversal") is one of the world's leading media and entertainment companies in the development, production, and marketing of entertainment, news and information to a global audience. NBCUniversal owns and operates a valuable portfolio of news and entertainment television networks, a premier motion picture company, significant television production operations, a

leading television stations group, world-renowned theme parks, and a suite of leading Internet-based businesses. NBCUniversal is a subsidiary of Comcast Corporation, which is publicly traded.  No other publicly-traded corporation owns more than 10% of NBCUniversal.

Paramount Pictures Corporation ("Paramount") is an American film studio based in Hollywood, California.  Paramount is the fifth oldest surviving film studio in the world and the second oldest in the United States.   Paramount is a subsidiary of Viacom, which is publicly-traded.  No other publicly-traded corporation owns more than 10% of Paramount.

Sony Pictures Entertainment ("SPE") is a subsidiary of Sony Entertainment Inc., which is a subsidiary of Sony Corporation, which is publicly-traded.   SPE's global operations encompass motion picture production, acquisition, and distribution; television production, acquisition, and distribution; television networks; digital content creation and distribution; operation of studio facilities; and development of new entertainment products, services and technologies. SPE's Motion Picture Group includes film labels Columbia Pictures, Screen Gems, TriStar Pictures, Sony Pictures Animation, and Sony Pictures Classics.  No other publicly-traded corporation owns more than 10% of SPE.

Twentieth Century Fox Film Corporation ("TCFFC") is one of the world's largest producers and distributors of motion pictures, producing and distributing

motion pictures throughout the world under a variety of arrangements.  Through various units, TCFFC produces and/or distributes motion pictures for mainstream audiences, specialized motion pictures, and feature length animated motion pictures.  TCFFC is an indirect subsidiary of Twenty-First Century Fox, Inc., which is publicly-traded.  No other publicly-traded corporation owns more than 10% of TCFFC.

Univision Communications Inc. ("UCI") is the leading media company serving Hispanic America. UCI is a leading content creator in the U.S. and includes the Univision Network, UniMás and Univision Cable Networks.  UCI also includes the Fusion Media Group, a division that serves young, diverse audiences, which includes cable networks and a collection of leading digital brands including Gizmodo, Deadspin and Jezebel.   No publicly-traded corporation owns more than 10% of UCI's stock.

Warner Bros. Entertainment Inc. ("Warner Bros.") is a global leader in all forms of entertainment and their related businesses across all current and emerging media and platforms. A Time Warner Company, the fully integrated, broad-based Warner Bros. is home to one of the most successful collections of brands in the world and stands at the forefront of every aspect of the entertainment industry from feature film, television and home entertainment production and worldwide distribution to DVD and Blu-ray, digital distribution, animation, comic books,

video games, product and brand licensing, and broadcasting.  Warner Bros. is a subsidiary of Time Warner, which is publicly-traded.  No other publicly-traded corporation owns more than 10% of Warner Bros.

# TABLE OF CONTENTS

Page

STATEMENT OF THE INTERESTS OF *AMICI* ....................................................1

SUMMARY OF ARGUMENT ...........................................................................2

ARGUMENT .................................................................................................6

    I.    THE INJUNCTION IS A CLASSIC EXAMPLE OF AN UNCONSTITUTIONAL PRIOR RESTRAINT OF SPEECH ...........6

        A.    Enjoining a Film Before It is Released is a Prior Restraint........6

        B.    The Filmmakers Did Not Waive Their First Amendment Rights ......................................................................................10

        C.    Interacting With People Who May Owe Contractual Confidentiality Duties Does Not Justify a Prior Restraint........12

    II.    THE INJUNCTION HERE WOULD HAVE EXACTLY THE KIND OF CHILLING EFFECT ON FILMMAKERS THE PRIOR RESTRAINT DOCTRINE EXISTS TO PREVENT.............16

CONCLUSION .............................................................................................23

# TABLE OF AUTHORITIES

Page(s)

**Cases:**

*Aetna Ins. Co. v. Kennedy ex rel. Bogash*,
301 U.S. 389 (1937).............................................................................11

*Bantam Books, Inc. v. Sullivan*,
372 U.S. 58 (1963).................................................................................8

*Bullfrog Films, Inc. v. Wick*,
847 F.2d 502 (9th Cir. 1988) ...............................................................21

*CBS Inc. v. Davis*,
510 U.S. 1315 (1994) .............................................................................9

*College Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.*,
527 U.S. 666 (1999)..............................................................................11

*Columbia Broad. Sys., Inc. v. U.S. Dist. Ct.*,
729 F.2d 1174 (9th Cir. 1984) ...............................................................9

*Diaz v. NBC Universal, Inc.*,
536 F. Supp. 2d 337 (S.D.N.Y. 2008), *aff'd*, 337 F. App'x 94
(2d Cir. 2009)..........................................................................................9

*Doe v. Marsh*,
105 F.3d 106 (2d Cir. 1997) .................................................................11

*Edelman v. Jordan*,
415 U.S. 651 (1974)..............................................................................11

*Eldred v. Ashcroft*,
537 U.S. 186 (2003)..............................................................................15

*First Nat'l Bank of Boston v. Bellotti*,
435 U.S. 765 (1978)..............................................................................21

*Freedman v. Maryland.*,
380 U.S. 51 (1965)..........................................................................7-8, 9

*Goldblum v. Nat'l Broad. Corp.*,
584 F.2d 904 (9th Cir. 1978) .................................................................9

*Harper & Row Publishers, Inc. v. Nation Enters.*,
471 U.S. 539 (1985)..............................................................................15

*In re Charlotte Observer*,
    921 F.2d 47 (4th Cir. 1990) ............................................................................9

*In re King World Prods., Inc.*,
    898 F.2d 56 (6th Cir. 1990) ..........................................................................22

*In re Providence Journal Co.*,
    820 F.2d 1342 (1st Cir. 1986)...................................................................9, 14

*Jordan v. Metro. Life Ins. Co.*,
    280 F. Supp. 2d 104 (S.D.N.Y. 2003) .........................................................23

*Joseph Burstyn, Inc. v. Wilson*,
    343 U.S. 495 (1952)........................................................................................7

*Kingsley Int'l Pictures Corp. v. Regents of Univ. of State of N.Y.*,
    360 U.S. 684 (1959)........................................................................................8

*Kleindienst v. Mandel*,
    408 U.S. 753 (1972)......................................................................................21

*Landmark Communications, Inc. v. Virginia*,
    435 U.S. 829 (1978)......................................................................................13

*Machleder v. Diaz*,
    801 F.2d 46 (2d Cir. 1986) ...........................................................................21

*Madsen v. Women's Health Ctr., Inc.*,
    512 U.S. 753 (1994)......................................................................................22

*Meador v. New Times, Inc.*,
    36 F.3d 1103 (9th Cir. 1994) ........................................................................23

*Metro. Opera Ass'n v. Local 100, Hotel Emps. & Rest. Emps. Int'l Union*,
    239 F.3d 172 (2d Cir. 2001) .........................................................................22

*Miami Herald Publ'g Co. v. Tornillo*,
    418 U.S. 241 (1974)................................................................................15, 21

*Nat'l Polymer Prods. v. Borg-Warner Corp.*,
    641 F.2d 418 (6th Cir. 1981) ........................................................................11

*Near v. Minnesota*,
    283 U.S. 697 (1931)................................................................................15, 22

*Nebraska Press Ass'n v. Stuart*,
    427 U.S. 539 (1976)....................................................................8, 13, 16, 22

*New Era Publ'ns Int'l, ApS v. Henry Holt & Co.*,
 695 F. Supp. 1493 (S.D.N.Y. 1988), *aff'd*, 873 F.2d 576
 (2d Cir. 1989)................................................................................23

*New Holland Vill. Condo. v. DeStaso Enters. Ltd.*,
 139 F. Supp. 2d 499 (S.D.N.Y. 1999), *aff'd*, 29 F. App'x 760
 (2d Cir. 2002)................................................................................11

*New York Times Co. v. United States*,
 403 U.S. 713 (1971)..............................................7, 12, 13, 15

*Org. for a Better Austin v. Keefe*,
 402 U.S. 415 (1971)..............................................................9, 13

*People ex rel. Arcara v. Cloud Books, Inc.*,
 68 N.Y.2d 553, 510 N.Y.S.2d 844 (1986)...................................15

*Porco v. Lifetime Entm't Servs., LLC*,
 116 A.D.3d 1264, 984 N.Y.S.2d 457 (3d Dep't 2014) .................10

*Proctor & Gamble Co. v. Bankers Trust Co.*,
 78 F.3d 219 (6th Cir. 1996) ..............................................13, 14

*Sambo's Rests., Inc. v. City of Ann Arbor*,
 663 F. 2d 686 (6th Cir. 1981) .....................................................11

*Superior Films, Inc. v.
 Dep't of Educ. of State of Ohio, Div. of Film Censorship*,
 346 U.S. 587 (1954).......................................................................7

*Tilton v. Capital Cities/ABC Inc.*,
 827 F. Supp. 674 (N.D. Okla. 1993) .............................................9

## Statutes & Other Authorities:

First Amendment to the U.S. Constitution .......................................*passim*

17 U.S.C. § 502 ...............................................................................15

Rule 32(4)(d) ....................................................................................1

## STATEMENT OF THE INTERESTS OF *AMICI*[3]

These *amici* include movie studios and television networks, which are among the leading producers and distributors of audiovisual entertainment and information, including movies, television and radio programs, numerous forms of digital entertainment and documentaries. These *amici* have produced and disseminated countless movies, television programs and documentaries that depict, or dramatize, significant historical events and personalities, including films much like Defendants-Appellants' ("the Filmmakers") film, tentatively titled *Street Survivors*, that was enjoined by the District Court.

*Amici* are therefore deeply familiar with, and maintain an abiding interest in, the First Amendment protections afforded the creators of films and television programs, which provide the foundation they rely upon to entertain, educate and inspire audiences around the globe. The creation of a movie, television mini-series or documentary necessitates the investment of enormous time and resources. All of these *amici* have been threatened with litigation because people did not like what a film or program portrayed, or because they claim a right to control its content. Yet to *amici*'s knowledge, outside the context of intellectual property disputes – and in decades' past, the regulation of obscenity – no appellate court has

---

[3] Pursuant to Rule 32(4)(d), no party's counsel authored this brief in whole or in part, and no party, party's counsel, or person other than the *amici curiae* contributed money to fund preparing or submitting this brief.

1

*ever* affirmed a prior restraint of a motion picture.  If this Court were to adopt the District Court's unprecedented and unconstitutional view of the prior restraint doctrine, it would significantly chill the willingness of content creators to undertake the substantial research necessary to create high-quality films, television programs and documentaries that depict real people and events.  Given the stakes of this case, these *amici* have a strong interest in – and are particularly well-situated – to provide the Court with insight into the importance of the Defendants-Appellants' First Amendment rights, as well as the practical ramifications of the District Court's decision.

## SUMMARY OF ARGUMENT

Motion pictures and television programs, including historical, fact-based dramas like *Street Survivors*, are fully protected by the First Amendment.  As a result, the injunction granted by the District Court ("the Injunction") is a classic, and blatantly unconstitutional, prior restraint of protected speech.  The Supreme Court, as well as this Court, has repeatedly affirmed that prior restraints are one of the most extraordinary remedies known to the law, and may only be available in rare and extreme circumstances that are not remotely presented here.

Nonetheless, the District Court determined that it could ignore almost 250 years of judicial hostility to prior restraints, because it concluded that the Filmmakers had waived their First Amendment rights.  That conclusion was not

2

only wrong, it likewise ignored decades of well-established law governing what constitutes a waiver of constitutional rights. The District Court did not point to any express waiver by the Filmmakers of their constitutional rights. Rather, it reasoned that because Defendant Pyle had waived **his** First Amendment rights by entering into a consent decree in 1988 ("the Consent Order"), and because 30 years later the Filmmakers knowingly interacted with Pyle, they constructively waived their own First Amendment rights as well.

However, it has long been settled that waivers of constitutional rights must be specific and unambiguous, not constructive or implied. The record below makes clear that far from waiving any rights, the Filmmakers expressly invoked and relied on their First Amendment right to produce *Street Survivors.* In many analogous contexts, courts have consistently held that the prior restraint doctrine bars injunctions against speakers and publishers, even when they knowingly interact with persons who may be subject to some contractual or other legal duty of confidentiality. Here, the Plaintiff-Appellants' interest in maintaining their private agreement regarding how they would like their very public, and historically significant, story to be told does not remotely rise to the level of an extraordinary, compelling interest necessary to justify a prior restraint.

The District Court also reasoned that no First Amendment issue is presented because the Injunction did not bar the filmmakers from making a film about the

3

1977 plane crash altogether, so they remain free to make a different film about the same subject. That reasoning was also wrong, as a matter of law. It is well-settled that restricting the parameters of permitted speech is no less a presumptively unconstitutional, content-based restriction on speech than barring a subject altogether.

Moreover, as a practical matter, filmmakers and television producers cannot readily "start over" in the event that a court finds something wanting with the actual film or program they set out to make. Making a film, television series or documentary, including a biographical movie, is an enormous undertaking, requiring substantial investments of research, money and time. In particular, content creators often seek out numerous sources of information, such as eyewitnesses, historians, other experts and archival material to make historical films. The District Court's decision has the potential to cause considerable disruption to the process of filmmaking, as it threatens to enjoin a film or television program if it turns out that a producer consulted with a person who is later found to have a pre-existing contractual or legal duty to someone else. And at that point, filmmakers, documentarians and other content creators cannot just begin anew and make a different project, without placing all their creative and monetary investments at risk.

4

Furthermore, even if these Filmmakers were to try to create a different film about the band Lynyrd Skynyrd, the Injunction would still be blatantly unconstitutional because it would effectively give the District Court editorial control over that movie as well. For example, the Injunction bars the Filmmakers from making any film with the "participation" of Pyle, if they want to use the "biographical material" of other band members. Those vague terms would surely lead to another round of litigation, in which the District Court would be asked to pass judgment on whether the next film complied with the Injunction. That prospect is a constitutional anathema, because the *sine qua non* of the prior restraint doctrine is that editorial control over the content of speech should rest with the speaker, not the courts.

Finally, the District Court left little doubt that it believed these particular Filmmakers lacked credibility and engaged in deceptive conduct, including conduct warranting spoliation sanctions. But even if true, none of those findings support enjoining the resulting movie. To be sure, filmmakers, like anyone else, may not act with impunity, and may be subject to monetary liability and other sanctions if they engage in unlawful behavior. And certain specific types of unlawful conduct, like copyright infringement, can support injunctions in appropriate circumstances. But nothing in the record of this case remotely

5

supports the prior restraint the District Court imposed, and so the judgment below
should be reversed.

## ARGUMENT

## I.   THE INJUNCTION IS A CLASSIC EXAMPLE OF AN UNCONSTITUTIONAL PRIOR RESTRAINT OF SPEECH

### A.   Enjoining a Film Before It is Released is a Prior Restraint

Historical and biographical dramas, like *Street Survivors*, are films and
television programs that dramatize the life of historically-based events and people.
Such dramas, including "biopics" (biographical movies), have long been a
celebrated genre of films and television.  For example, *Malcolm X* was a 1992 film
about the civil rights activist; *Invictus* portrayed events in South Africa before and
during the 1995 Rugby World Cup; *The People v. O.J. Simpson: American Crime
Story*, was a 2016 television series based on the infamous O.J. Simpson murder
case; *Recount* was a 2008 television film about the recount process in Florida
following the 2000 presidential election; and most recently, *Spotlight* told the story
of the team of *Boston Globe* reporters that shed light on the Catholic Church's
cover-up of sexual abuse by priests.[4]  In particular, movies depicting not just the
music, but the life experiences of popular musicians have long been a favorite with

---

[4] Indeed, acclaimed films dramatizing real people and events are ubiquitous.
Recent examples include *Battle of the Sexes*, *Hidden Figures*, *Moneyball*, *The
Social Network*, *Snowden*, *Jackie*, *The Theory of Everything*, *Capote*, *Frost/Nixon*,
*A Beautiful Mind*, *The Perfect Storm*, *The Big Short*, *American Sniper*, *Philomena*,
*The Help*, *Zero Dark Thirty*, and *The Hurt Locker*, among many others.

audiences, like *Selena*, a 1997 film about the life and career of musician Selena

Quintanilla-Perez; *Ray*, a 2004 film focusing on the first thirty years in the life of

musician Ray Charles; *Walk the Line*, a 2005 film based on the early life and

career of Johnny Cash; and 1997's *La Bamba*, which told the story of Richie

Valens, who, like several Lynyrd Skynyrd band members portrayed in *Street*

*Survivors*, met an untimely death in a plane crash.[5]

Like all audiovisual entertainment, biopics and historical dramas are entitled

to the same First Amendment protection as books or newspapers. *See Joseph*

*Burstyn, Inc. v. Wilson*, 343 U.S. 495, 501-02 (1952) ("The importance of motion

pictures as an organ of public opinion is not lessened by the fact that they are

designed to entertain as well as to inform."); *Superior Films, Inc. v. Dep't of Educ.*

*of State of Ohio, Div. of Film Censorship*, 346 U.S. 587, 589 (1954) ("Motion

pictures are of course a different medium of expression … [b]ut the First

Amendment draws no distinction between the various methods of communicating

ideas."). In fact, much of the evolution of current prior restraint jurisprudence

arose out of government efforts to censor movies. *See, e.g.*, *Freedman v.*

---

[5] In fact, one of the landmark prior restraint cases that is cited extensively in this brief – *New York Times Co. v. United States*, 403 U.S. 713 (1971), the famous *Pentagon Papers* case – will soon itself be the subject of movie to be entitled *The Post*, directed by Steven Spielberg. http://variety.com/2017/film/awards/steven-spielberg-pentagon-papers-movie-the-post-1202539636/.

*Maryland.*, 380 U.S. 51, 57 (1965); *Kingsley Int'l Pictures Corp. v. Regents of Univ. of State of N.Y.*, 360 U.S. 684, 688-89 (1959).

The Supreme Court has repeatedly affirmed that "[i]t has been generally, if not universally, considered that it is the chief purpose of the (First Amendment's) guaranty to prevent previous restraints…P rior restraints are the essence of censorship, and [o]ur distaste for censorship reflecting the natural distaste of a free people is deep-written in our law." *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 588-89 (1976) (Brennan, J., concurring) (internal quotation marks and citations omitted). Therefore, prior restraints are "the most serious and the least tolerable infringement on First Amendment rights" and "one of the most extraordinary remedies known to our jurisprudence." *Id.* at 559, 562. Therefore, "[a]ny system of prior restraints of expression comes to this Court bearing a heavy presumption against its constitutional validity." *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963).

The Injunction prohibits a movie from being distributed prior to its release; that is the essence of a prior restraint. *See Freedman*, 380 U.S. at 57. Moreover, "[p]rohibiting [a filmmaker] from making a particular movie in a particular fashion," as the District Court characterized the Injunction, is no less a prior restraint that barring the subject-matter altogether. In fact, the Maryland motion picture censorship statute struck down in *Freedman* gave censors specific

8

discretion to either disapprove a film entirely, or to make approval contingent on

the "elimination" of selected content. 380 U.S. at 57-59.  Indeed, most prior

restraints struck down by courts are, in essence, injunctions that prohibit speech

from being expressed in a "particular fashion."  *See, e.g., CBS Inc. v. Davis*, 510

U.S. 1315, 1317-18 (1994) (Blackmun, J., in chambers) (setting aside state court

preliminary injunction against a television network because it contained certain

images allegedly obtained through trespass); *Org. for a Better Austin v. Keefe*, 402

U.S. 415, 418-19 (1971); *In re Charlotte Observer*, 921 F.2d 47, 49 (4th Cir. 1990)

(vacating injunctions prohibiting news organizations from including the name of

an attorney in their news reports about a trial as  unconstitutional prior restraints);

*In re Providence Journal Co.*, 820 F.2d 1342, 1350 (1st Cir. 1986) (vacating TRO

against newspaper's publication of certain materials as unconstitutional prior

restraint); *Columbia Broad. Sys., Inc. v. U.S. Dist. Ct.*, 729 F.2d 1174, 1184 (9th

Cir. 1984) (vacating injunction enjoining television network broadcasting

surveillance tapes as a prior restraint); *Goldblum v. Nat'l Broad. Corp.*, 584 F.2d

904, 907 (9th Cir. 1978) (vacating order to produce film for review as a prior

restraint); *Diaz v. NBC Universal, Inc.*, 536 F. Supp. 2d 337, 339 (S.D.N.Y. 2008)

(denying injunctive relief to enjoin the distribution of the movie *American

Gangster*), *aff'd*, 337 F. App'x 94 (2d Cir. 2009); *Tilton v. Capital Cities/ABC Inc.*,

827 F. Supp. 674, 682 (N.D. Okla. 1993) (denying injunction against broadcast

9

regarding TV evangelists as prior restraint); *Porco v. Lifetime Entm't Servs., LLC*, 116 A.D.3d 1264, 1266, 984 N.Y.S.2d 457, 459 (3d Dep't 2014) (vacating TRO enjoining distribution of television movie because it contained some allegedly fictionalized scenes). In fact, to *amici*'s knowledge, outside of the context of intellectual property disputes and the regulation of sexually explicit content, no appellate court has *ever* affirmed a prior restraint of a motion picture.

### B. The Filmmakers Did Not Waive Their First Amendment Rights

Yet remarkably, the District Court dismissed all those bedrock constitutional principles as irrelevant. Instead, the District Court reasoned that the Injunction does not raise any First Amendment issue at all, because in its view the Filmmakers had waived their First Amendment rights. However, the District Court did not point to any evidence in the record suggesting that the Filmmakers had expressly waived any rights. Rather, the District Court first concluded that *Pyle* had expressly waived his First Amendment rights, when he signed the Consent Order. And though the Filmmakers were not parties to the Consent Order – indeed, Cleopatra Films did not even exist in 1988 – the District Court reasoned that they also bargained away their constitutional rights when they "chose to do business" with Pyle, after learning the terms of the Order.[6]

---

[6] The Consent Order was filed under seal, so the filmmakers had no way to know of its contents until apparently being informed about it mid-production, by Plaintiffs-Appellees.

In essence, the District Court concluded that the Filmmakers had constructively waived any First Amendment rights by creating a movie with Pyle's participation. But as the Supreme Court has repeatedly warned, "constructive consent is not a doctrine commonly associated with the surrender of constitutional rights." *College Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 681 (1999) (*quoting Edelman v. Jordan*, 415 U.S. 651, 673 (1974)). Rather, "courts indulge every reasonable presumption against waiver" of fundamental constitutional rights. *Aetna Ins. Co. v. Kennedy ex rel. Bogash,* 301 U.S. 389, 393 (1937). *See also New Holland Vill. Condo. v. DeStaso Enters. Ltd.*, 139 F. Supp. 2d 499, 502 (S.D.N.Y. 1999) (courts "are uniformly hostile to the concept of 'constructive' waiver of a constitutional right."), *aff'd*, 29 F. App'x 760 (2d Cir. 2002). Thus, as with other constitutional rights, contractual waivers of First Amendment rights must be intentional, clear, and narrowly construed. *Doe v. Marsh*, 105 F.3d 106, 111 (2d Cir. 1997) (recognizing that waiver of a fundamental right in the civil context must be "voluntary, knowing and intelligent"); *Nat'l Polymer Prods. v. Borg-Warner Corp.*, 641 F.2d 418, 423-24 (6th Cir. 1981) (relinquishment of First Amendment rights must be "clear and compelling" and "narrowly construed"); *Sambo's Rests., Inc. v. City of Ann Arbor*, 663 F. 2d 686, 689 (6th Cir. 1981).

11

Yet far from containing even a scintilla of evidence of actual waiver, the record below makes clear that the Filmmakers explicitly invoked and relied on their First Amendment rights when the Plaintiff-Appellants demanded that they cease producing the film. If anything, this case presents the antithesis of a *bona fide* waiver of a constitutional right. As a result, the District Court was not free to ignore the First Amendment, and its Injunction was an unconstitutional prior restraint.

### C. Interacting With People Who May Owe Contractual Confidentiality Duties Does Not Justify a Prior Restraint

Nor is the Injunction any less an unconstitutional prior restraint merely because the Filmmakers "chose to do business" with Pyle. Courts have considered many analogous scenarios in which one party, like the Filmmakers, interacted with and obtained information from another party who, like Pyle, may have waived his or her First Amendment rights by virtue of a contract, court order, or even by operation of criminal statutes. Yet even where severe harm to national security was alleged, courts have consistently found that enjoining the third-party's speech is no less an unconstitutional prior restraint.

In *New York Times Co. v. United States*, 403 U.S. 713 (1971)(per curiam), two newspapers published a highly classified Department of Defense report leaked by a confidential source, who was subsequently prosecuted for having provided the documents to the press. In substance, one of the Government's arguments was that

12

because the newspapers had knowingly chosen to do business with a source who broke the law, a prior restraint was an appropriate remedy. *Id.* at 754 (Harlan, J., dissenting) (summarizing the Government's claim that the *Pentagon Papers* had been "purloined from the Government's possession and [] the newspapers received them with knowledge that they had been feloniously acquired."). The Supreme Court nonetheless held that the Government had not met its "heavy burden of showing justification for the imposition of such a restraint." *Id.* at 714 (quoting *Org. for a Better Austin*, 402 U.S. at 419). And even though in the hierarchy of First Amendment jurisprudence criminal sanctions can be considered a lesser remedy than a prior restraint, *Nebraska Press Ass'n*, 427 U.S. at 559, in *Landmark Communications, Inc. v. Virginia*, 435 U.S. 829 (1978), the Supreme Court rejected that remedy as well, in analogous circumstances. In *Landmark*, a newspaper obtained from a confidential source the identity of a judge who was the subject of a judicial disciplinary proceeding, and published it in a news story. Though a Virginia criminal statute barred both the source and the newspaper from disseminating information about judicial discipline, the Court held that the First Amendment barred the application of the statute to the newspaper.

The District Court's flawed waiver analysis also led it to dismiss the relevance of *Proctor & Gamble Co. v. Bankers Trust Co.*, 78 F.3d 219, 225 (6th Cir. 1996), but that case directly speaks to why the District Court's "chose to do

13

business" theory of constructive waiver was erroneous. In *Proctor & Gamble*, the parties to a civil case entered into a stipulated protective order to treat documents exchanged in discovery as confidential. However, upon learning that *Business Week* had obtained some of the documents that "the parties wanted to remain secret," the district judge enjoined the magazine from publishing the documents on the grounds that it had "knowingly violated the protective order." *Id.* at 222-23.

The Sixth Circuit reversed, however, holding that for purposes of considering a prior restraint, the proper inquiry was "whether *Business Week's* planned publication of these particular documents posed such a grave threat to a critical government interest or to a constitutional right as to justify the District Court's three injunctive orders." *Id.* at 225. The Court held that no such threat was posed, because "[t]he private litigants' interest in protecting their vanity or their commercial self-interest simply does not qualify as grounds for imposing a prior restraint." *Id. See also In re Providence Journal*, 820 F.2d at 1349 ("Even if the materials had been given to the Journal improperly or unlawfully, a prior restraint against publication would still be improper.").

The principles established in those cases compel the conclusion that the District Court's Injunction imposes an unconstitutional prior restraint. Outside the context of intellectual property disputes[7], prior restraints may be justified, if at all,

---

[7] Injunctions can be a permissible remedy for conduct such as copyright

only in the most exceptional circumstances – such as to prevent the publication of the sailing dates of troop ships or the location of soldiers in wartime, *Near v. Minnesota*, 283 U.S. 697, 716 (1931), or to "suppress[] information that would set in motion a nuclear holocaust." *New York Times Co.*, 403 U.S. at 726 (Brennan, J., concurring). *See also Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 259 (1974) (White, J., concurring) ("the First Amendment erects a virtually insurmountable barrier" against the issuance of a prior restraint on the media); *People ex rel. Arcara v. Cloud Books, Inc.*, 68 N.Y.2d 553, 558, 510 N.Y.S.2d 844, 847 (1986) (prior restraint unconstitutional under New York law "absent a showing on the record that such expression will immediately and irreparably create public injury"). The presumption against prior restraints is so overwhelming that the Supreme Court has *never* affirmed an order enjoining the press from publication – not even with the publication of military secrets, *New York Times Co.*, 403 U.S. at 714 (reversing injunction prohibiting publication of Pentagon Papers as prior restraint on speech), or countervailing constitutional rights arguably at stake,

---

infringement because in its totality, copyright law functions to incentivize and thus increase the total pool of original expression available to the public, and First Amendment concerns are addressed through the fair use and idea/expression dichotomy. *Eldred v. Ashcroft*, 537 U.S. 186, 219 (2003). Permitting the theft of intellectual property would only serve to inhibit the development of expression, which is why the Constitution itself authorizes the creation of copyrights. *See, e.g.*, 17 U.S.C. § 502; *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 545 (1985) ("[C]opyright is intended to increase and not to impede the harvest of knowledge."). No similar, speech-protective function is served by enforcing the private wishes of participants in historical events to control how history may be depicted.

*Nebraska Press Ass'n*, 427 U.S. at 570 (in case where a defendant's Sixth Amendment rights were at issue, overturning preliminary injunction preventing publication of accounts of widely publicized murder).

Here, the Consent Order merely protects the Plaintiffs-Appellees' private interest in protecting a 30-year old agreement, loosely adhered to over the years by the Plaintiffs-Appellees themselves, to try to influence the way the story of an historical event of widespread public interest may be told. That is not remotely the kind of overriding state interest that might warrant enjoining the development, production and distribution of a historical drama like *Street Survivor*. And it is certainly not an interest that should lead this Court to be the first in American history to affirm a prior restraint of this nature.

## II. THE INJUNCTION HERE WOULD HAVE EXACTLY THE KIND OF CHILLING EFFECT ON FILMMAKERS THE PRIOR RESTRAINT DOCTRINE EXISTS TO PREVENT

The Supreme Court has held that "[i]f it can be said that a threat of criminal or civil sanctions after publication "chills" speech, a prior restraint "freezes" it at least for a time." *Nebraska Press Ass'n*, 427 U.S. at 559. The District Court's Opinion, however, failed to recognize how the Injunction directly, and negatively, impacts the development of movies, television programs, and other media that focus on matters of public concern. The process of producing films and television programs, including historical dramas, biopics and documentaries, is lengthy and

16

involves hundreds of people and a substantial investment of resources. This is in large part due to the time and resources necessary to depict historical events with sensitivity, creativity and accuracy. And filmmakers depicting real people and events frequently employ as consultants actual participants in the events a film depicts, in an effort to add "color" about which an outsider would be unaware, and increase the overall degree of verisimilitude.

Some of the most revered historical dramas of the modern era went through years-long processes of research, writing, casting, directing and editing before completion. For instance, the celebrated film *Gandhi* took nearly two decades to create.[8] Richard Attenborough, the film's director, hired three screenwriters to develop the script, watched hours and hours of newsreel footage of Gandhi, and spent years reviewing little-known documents about Gandhi's life.[9] Once filming got underway, Attenborough set a *Guinness World Record* for the most extras used in any film by employing 300,000 extras for Gandhi's funeral scene.[10] The people

---

[8] *See* http://timesofindia.indiatimes.com/india/Making-Gandhi-was-a-harrowing-ordeal-for-Attenborough/articleshow/40869405.cms  (*"Times of India* Article").

[9] http://www.nytimes.com/packages/html/movies/bestpictures/gandhi-ar1.html ("*Gandhi NYT* Article"); https://www.webofstories.com/play/billy.williams/116;jsessionid=D8A0E94B9ED07226371CBF42FA4C5EAB ("Web of Stories – Preparing to Shoot Gandhi");*Times of India* Article.

[10] http://www.imdb.com/title/tt0083987/trivia?ref_=ttfc_ql_trv_1.

and entities mentioned in the screen credits for the film total 223, but do not even account for all the uncredited historical consultants who helped guide the film.[11]

Similarly, *Lincoln,* a film about President Lincoln's signing of the Emancipation Proclamation, went through several pre-production iterations. It took the screenwriter six years to complete the final 500-page script, a process he began by convening a meeting with multiple historians.[12] In the end, *Lincoln* took 12 years to complete. The screen credits alone included 208 actors, seven producers, one historical consultant, and 65 production assistants tasked with delving into all the period details.[13] One sound designer even sent someone to the Kentucky Historical Society to record the ticking of Lincoln's pocket watch.[14] Other contemporary biopics, like *Malcolm X*[15] and *Spotlight*[16], often also make extensive use of archival and other source materials that can require years of careful research, selection and financing to assemble, as do most documentaries.

---

[11] See *Web of Stories – Preparing to Shoot Gandhi*; *Gandhi NY Times* Article

[12] https://www.youtube.com/watch?v=k-_kORNN4cw.

[13] *Lincoln NY Times* Article;
http://www.imdb.com/title/tt0443272/fullcredits?ref_=tt_ov_st_sm.

[14] *Lincoln NY Times* Article.

[15] *See http://partners.nytimes.com/library/film/111592lee-malcolm-content.html* (describing the director's careful study and selection of historical resources to learn about all the different periods of Malcolm X's life).

[16] http://www.vulture.com/2015/11/tom-mccarthy-on-spotlight-oscars.html (describing how the screenwriter had to hire a co-writer to assist him with analysis of seven volumes of reporting clips relating to the investigation into the Catholic Church and multiple interviews of lawyers, former reporters, publishers, editors, survivors).

The notion, therefore, that a filmmaker can simply start over and make a new film if his or her original project is enjoined, especially a few months before it is scheduled to be released, wholly ignores the realities of film production.

Moreover, it is always possible that any one of the scores of persons and entities who participate in the creation of an historical drama might turn out to have been bound by some prior, private contractual restriction. And often a filmmaker might become aware of that restriction well after that person's contribution had become a part of the entire project. For example, the award-winning documentary *Going Clear: Scientology and the Prison of Belief* included interviews with former members of the Church of Scientology who, the Church alleged, violated their contractual obligations to the Church by participating in the documentary.[17] The mere possibility that that scenario could lead to enjoining an entire film would significantly add to the existing risk of creating audiovisual entertainment for all content producers, both large and small, who could not readily just make another movie in a different "fashion."

And even if the Filmmakers were to produce another movie about the 1977 plane crash, the Injunction would impose clearly unconstitutional burdens on that project as well. That is because not only does the Injunction restrain *Street Survivors*, it also imposes content-based restrictions on any other film related to

---

[17] https://www.theguardian.com/film/2015/jun/28/alex-gibney-going-clear-scientology-and-the-prison-of-belief-interview-documentary-film

Lynyrd Skynyrd that the Filmmakers might ever try to create.  For example, the Injunction bars the Filmmakers from making any film with the "participation" of Pyle, if they want to use (among other content-based restrictions) the "biographical material" of certain other band members.

But the meaning of those terms is hardly self-evident.  For example, if the Filmmakers were to include some information they learned from Pyle in a subsequent project, would that be deemed to violate the Injunction by constituting his "participation?"  Should the Filmmakers therefore err on the side of making an alternative film a more *inaccurate* account of the 1977 plane crash, for fear that including any truthful information they previously learned from Pyle might subject them to contempt?

Given the obviously contentious relationship between these parties, it is surely no exaggeration to suggest that the District Court could well be asked to review, and pass judgment upon, whether even the next project should be made in "a different fashion."  As a practical matter, the Injunction therefore gives the District Court effective and indefinite editorial control over any Lynyrd Skynyrd movie by these Filmmakers.  But that flies in the face of the Supreme Court's admonition, which applies no less to motion pictures, that "the choice of material to go into a newspaper, and the decisions made as to . . . [its] treatment of public issues and public officials . . . constitute the exercise of editorial control and

20

judgment," and thus may not be subject to governmental regulation consistent with First Amendment guarantees of a free press. *Tornillo*, 418 U.S. at 258 (1979). *See also Bullfrog Films, Inc. v. Wick*, 847 F.2d 502, 510 (9th Cir. 1988) ("The danger inherent in government editorial oversight [of films], even in the interest of 'balance,' is well established."); *Machleder v. Diaz,* 801 F.2d 46, 55 (2d. Cir. 1986) ("A court cannot substitute its judgment for that of the press").

Finally, the District Court paid no regard at all to the interests of the public, many of whom may prefer to watch the film that the creators of *Street Survivors* set out to make, rather than a different movie produced without the input of one of the actual passengers who survived the famous plane crash. *See, e.g.*, *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 783 (1978) ("[T]he First Amendment goes beyond protection of the press and the self-expression of individuals to prohibit government from limiting the stock of information from which members of the public may draw."); *Kleindienst v. Mandel,* 408 U.S. 753, 762 (1972) ("In a variety of contexts, this Court has referred to a First Amendment to receive information and ideas."). For that reason, one of the many policy reasons supporting the prior restraint doctrine is the recognition that, unlike post-publication sanctions on speech, prior restraints have the certain effect of permanently depriving the public of access to speech, even where (as here) the subject-matter is plainly one of substantial and legitimate public interest.

21

*Nebraska Press Ass'n,* 427 U.S. at 559 ("A criminal penalty or a judgment in a

defamation case is subject to the whole panoply of protections afforded by

deferring the impact of the judgment until all avenues of appellate review have

been exhausted."); *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 764

(1994) ("Injunctions … carry greater risks of censorship and discriminatory

application than do general ordinances."); *Metro. Opera Ass'n v. Local 100, Hotel*

*Emps. & Rest. Emps. Int'l Union*, 239 F.3d 172, 176 (2d Cir. 2001).

Unlike prior restraints, post-publication remedies like monetary damages are

necessarily tailored to the actual, rather than the speculative, impact of the speech

at issue.  Thus, vacating the Injunction would not leave filmmakers, television

producers and documentarians free to ignore the rights of others.  But neither

adverse inferences about what missing text messages might contain, nor even

tortious conduct by a filmmaker, would support a prior restraint of a movie.

Indeed, the First Amendment's preference for post-publication remedies is so

strong that even where there has been a final judicial determination that media

content was defamatory, invasive of privacy, or otherwise tortious, courts have

consistently held the sole remedy remains money damages, not proceedings to

restrain the offending speech.  *See Near*, 283 U.S. 697; *Nebraska Press Ass'n*, 427

U.S. at 559; *In re King World Prods., Inc.*, 898 F.2d 56, 59 (6th Cir. 1990)

(vacating TRO against broadcast of news program as unconstitutional prior

22

restraint, over claim that some of its contents invaded the plaintiff's privacy); *New Era Publ'ns Int'l, ApS v. Henry Holt & Co.*, 695 F. Supp. 1493, 1525 (S.D.N.Y. 1988) ("[W]e accept as black letter that an injunction is not available to suppress defamatory speech."), *aff'd*, 873 F.2d 576 (2d Cir. 1989); *Jordan v. Metro. Life Ins. Co.*, 280 F. Supp. 2d 104, 111-12 (S.D.N.Y. 2003) (injunction against alleged defamation "would be unconstitutional as a prior restraint on freedom of expression"); *Meador v. New Times, Inc.*, 36 F.3d 1103 (9th Cir. 1994) (in case for defamation and false light, denying injunction as an unconstitutional prior restraint).

## CONCLUSION

At bottom, the District Court enjoined a movie about a significant historical event, because 30 years ago one of the key participants in that event agreed to a judicially-sanctioned "blood oath" not to interact with any biographers, historians, filmmakers or documentarians without the approval of the others. In these circumstances, the injunction against a party that never made any oath, nor agreed to be bound by any contract or consent order, is clearly an unconstitutional prior restraint of speech. For the foregoing reasons, *amici* respectfully urge this Court vacate the Injunction.

Respectfully submitted,

DAVIS WRIGHT TREMAINE LLP

NATHAN SIEGEL
L. DANIELLE TOALTOAN

By____/s/ Nathan Siegel_____
    Nathan Siegel

    1251 Avenue of the Americas, 21st Fl.
    New York, NY 11201
    Telephone: (212) 489-8230
    Facsimile: (212) 489-8340

    *Attorneys for Amici Curiae*


Dated:     October 6, 2017

## __CERTIFICATE OF COMPLIANCE__

This document complies with the type-volume limit of Fed. R. App.

P. 32(a)(7)(B), the word limit of Local Rule 32.1(a)(4) (A)because,

excluding the parts of the document exempted by Fed. R. App. P. 32(f) this

document contains 5,425 words,

This document complies with the typeface requirements of Fed. R.

App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6)

because this document has been prepared in a proportionally spaced typeface

using Microsoft Word in 14-point font Time New Roman.


Dated:      October 6, 2017

/s/ L. Danielle Toaltoan